## United States *v.* Race Co. (No. 3807)[1]

United States Court of Customs and Patent Appeals, November 5, 1934

*Joseph R. Jackson,* Assistant Attorney General (*Richard E. FitzGibbon,* special attorney, of counsel), for the United States.

*Curie, Lane & Wallace* (*Samuel Isenschmid* of counsel) for appellee.

[Oral argument October 5, 1934, by Mr. FitzGibbon and Mr. Isenschmid]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

Merchandise was imported by the appellee under the Tariff Act of 1930, in two shipments, which was returned by the collector at the port of New York as manufactures of metal not specially provided for, under paragraph 397 of said tariff act. A protest was filed covering both importations, in and by which protest the goods were claimed to be dutiable as all other machines, finished or unfinished, under paragraph 372, as not enumerated unmanufactured or manufactured articles under paragraph 1558, or as woven-wire cloth under paragraph 318 of said tariff act. On trial before the United States Customs Court, the protest was sustained under said paragraph 372 and overruled as to the other grounds of protest.

The Government has appealed from this judgment, and here insists upon the correctness of the collector's classification for duty.

---

[1] T. D. 47362.

The imported merchandise constitutes parts for dialysers, which dialysers are used for the extraction of pure caustic soda from a solution of impure caustic soda. All of the imported material is of metal, and consists, as shown by the record and by the decision of the trial court, of the following:

1. Seven metal tanks, each about 10 feet long, 5 feet wide, and 4 feet high.
2. Seven hundred wire grids about 9 feet long, similar to exhibit 1 herein.
3. Three hundred and fifty wire-mesh nets about 9 feet long and 3 feet wide, similar to exhibit 2 herein.
4. A large number of miscellaneous fittings.

The trial court also thus describes the construction of the individual dialysers and their operation:

When installed in place, each so-called "dialyser" comprises 1 tank, 100 wire grids, 50 wire-mesh nets, 50 cotton bags or diaphragms, and the necessary fittings and connections. The cotton bags or diaphragms are of American manufacture and are represented herein by illustrative exhibit A. There is also in evidence as exhibit B a sketch of an assembled and erected dialyser. Its operation is thus described by the witness Louis E. Lovett, the owner of the plaintiff corporation:

* * * We have a tank in which there are groups of the diaphragms * * * running lengthwise with the tank, very close to each other but not touching. These bags are sewed up at both ends and along all the edges. However, they are not watertight. If water is poured into them, water will come out of them. Into the top of these bags [referring to sketch, illustrative exhibit B] is connected a series of short pipes, fed from a trough, and at the bottom of each one of these bags, and at two places at the ends, there are connected small pipes, which are in turn connected to the connecting header as shown on the sketch. In the tank itself we have provision for feeding in what is known as the impure caustic soda, which is a waste product in this process, in the process to which this is applied. This caustic soda has become impure from being used, and it is necessary, in order to utilize the caustic soda again, to remove these impurities, which are practically dissolved impurities; they cannot be seen by the eye. We feed, then, the impure material into the tank, so that it flows into the bottom of the tank through the pipe. We also feed water into this trough, which is connected to each individual one of these diaphragms. Now this is an open trough, and this is open [indicating on sketch]. We have no pressure whatever on this apparatus. The two liquids are practically the same level, there being a very slightly higher level of water than there is of the caustic soda, amounting to perhaps a quarter of an inch. There is no difference in level as it ordinarily would be necessary in order to force something through.

Now, the water coming into this trough goes into the inside of the bag, and on the outside of the bag in the tank itself there is this impure caustic soda, so that then we have a bag full of water and completely surrounding that a tank full of caustic soda, which is impure. The water now tends to absorb, we might say, the caustic soda out of the impure solution, which it does by a force known as "osmosis." There can be no filtration, because there is no difference in pressure, but the water has such a strong affinity for this caustic soda that it pulls it out of this impure solution, and the water gradually becomes stronger and stronger with caustic soda, and as it becomes stronger it becomes heavier. Soda has a higher specific gravity than water. Soda is then permitted to leave the bottom of the bag and flows to a central connecting header through these pipes, and from there is brought up to a visible outlet, which is open, there being no pressure on it. It just simply flows through a slight feeding in the action of this here [referring to sketch] and the water and caustic soda. The caustic soda which has come in here is very strong. It is impure and is colored usually from impurities. As it loses its caustic soda, that liquid becomes progressively lighter and rises to the top, so that by the time the liquid itself has lost its weight of caustic soda we are ready to get rid of it, and we allow it to flow out through this waste outlet.

Now, by that means, we secure a definite recovery of caustic soda, of approximately 450 pounds a day of actual caustic soda—actual dry caustic soda, equiva-

lent of that—and we have a definite transfer from one point in the apparatus to the other by the force of osmosis, there being absolutely no difference in pressures on the two sides due to what we would ordinarily call hydrostatic head or pressure head, it being a force applied to a body of water higher than—or a body of any liquid higher than—some other point, as for instance, in our water supply line here; at the ordinary tap in the lavatory we would possibly have a pressure of 40 pounds, corresponding to a hydrostatic head of about 80 feet. Here we have no difference in hydrostatic head, so we claim that there is no force utilized from the outside, such as hydrostatic force, but we do have the force of osmosis, which clearly causes the caustic soda to leave its solution and go into the water solution.

The process employed is not one of filtration but of osmosis. The latter is defined by the witness—

as a force which utilizes in the dialyser the principle that two solutions of different strengths when placed in contact with one another will cause one of the dissolved substances in that solution to try to go into the other solution.

There is no motive power that runs the apparatus and no hydraulic power employed in its operation. By the process 90 percent of caustic soda is rendered pure.

In addition to the testimony above quoted, the witness, Hal T. Beans, a professor of chemistry at Columbia University, was called, and demonstrated to the court the difference in operation between filtration and osmosis. This witness also expressed the opinion that there was no chemical action, but that there was a mechanical action, involved in osmosis.

Upon this testimony the trial court concluded, relying largely upon the authority of *United States* v. *Bourgondien*, 16 Ct. Cust. Appls. 420, T. D. 43135, and *United States* v. *Janson Co.*, 16 Ct. Cust. Appls. 315, T. D. 43075, that the imported materials constituted parts of machines.

The question as to the meaning of the word "machine", in customs law, has been the subject of repeated decisions of the Board of General Appraisers, now the United States Customs Court, and of this court.

One of the early decisions on the subject by this court is *Simon, Buhler & Baumann* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537. In that case, metal parts of a brewer's mash filter were involved. As assembled, this filter constituted a large boxlike structure in which filtration of mash was carried on. We held that this filter could not be regarded as "a mechanical contrivance for utilizing, applying, or modifying energy or force or for the transmission of motion", and, hence, was not a machine within the common meaning of the word "machine."

In *United States* v. *Janson Co., supra*, we held a radio receiving set to be a machine, although an outside antenna and its parts were not. In *United States* v. *Bourgondien, supra*, we held that a metal sterilizing apparatus, in which steam was fed through certain valves and pipes from a boiler to a coil in the bottom of a vat, and whereby it heated the sterilizing water to the proper temperature, was a machine.

Again, in *United States* v. *Reid & Co.*, 17 C. C. P. A. (Customs) 253, T. D. 43675, steam separators, which consisted of tanks in which the steam, because of the structure of these tanks, traveled in a circular path and threw off drops of water of condensation as it progressed, were held not to be machines. In *United States* v. *Klingerit*, 17 C. C. P. A. (Customs) 472, T. D. 43931, metal valves, operated by hand and used in regulating the quantity of steam or other liquids which might flow through them, were held not to be machines.

In *United States* v. *McNab*, 21 C. C. P. A. (Customs) 406, T. D. 46928, a torsion meter used to determine the horsepower of the engine of a vessel transmitted through the propeller shaft was held not to be a machine within the rule announced in the *Simon, Buhler & Baumann* case, *supra*.

An interesting case on the subject in the trial court is *Bird* v. *United States*, 55 Treas. Dec. 884, T. D. 43445. Certain pipes, valves, and fittings, and electrodes for electrolytic and distillation tanks were classified as manufactures of graphite, porcelain, and metal, and were claimed to be dutiable as parts of machines. The court, in denying such claim, said, in part:

In our opinion this device does not respond to the tariff definition of a machine as set forth in Simon *v.* United States (8 Ct. Cust. Appls. 273, T. D. 37537). The converting process that it performs is accomplished by a chemical force which in no way employs energy or force in a mechanical way. In other words, this device fails in the first essential of a machine within the tariff interpretation of the term, to wit, it is not a mechanical contrivance or device. * * *

Judge Smith, in speaking for the court in the *Simon, Buhler & Baumann* case, *supra*, was not attempting to lay down a hard and fast definition for the word "machine", as a result of which every article that utilized, applied, or modified energy or force, or transmitted motion, must be classified as a machine. In addition to this, it must be "a mechanical contrivance." What is or is not such a mechanical contrivance depends upon the facts in each case. This factor was appreciated, and expressed by the trial court in the *Bird* case, *supra*, in the quoted excerpt.

We have, on several occasions, indicated that the language in the *Simon, Buhler & Baumann* case, *supra*, must be given a reasonable meaning and not be too strictly and closely construed. *United States* v. *Reid, United States* v. *Klingerit, United States* v. *McNab, supra; United States* v. *Stern & Co.*, 21 C. C. P. A. (Customs) 246, T. D. 46777. See also *United States* v. *Laing, etc.*, 21 C. C. P. A. (Customs) 235, T. D. 46763.

For instance, the mash filter in the *Simon, Buhler & Baumann* case, *supra*, might be said to utilize the force of gravity, the separators in *United States* v. *Reid & Co., supra*, might be said to utilize force, the valves in *United States* v. *Klingerit, supra*, might be said to modify

energy, and the torsion meter in *United States* v. *McNab, supra,* might technically be said to utilize energy or force. But they were not such "mechanical contrivances", as, in the mind of the court, came within the meaning of the word "machine" as was announced in the *Simon, Buhler & Baumann* case, *supra.*

Are the dialysers before us here such machines? We think not. They constitute only receptacles in which the force of osmosis is permitted to operate. They are no more than a tank in which a membrane is suspended, separating a body of clear water and a body of impure caustic soda in solution. That osmosis is a force cannot be doubted, but so is gravity, and chemical affinity, and catalysis, and condensation. Certainly, however, a tank or container in which these natural forces are permitted to operate, without mechanical manipulation or assistance, does not raise such a tank or container to the dignity of a machine. Here these imported grids and nets do nothing more than suspend the cloth sacks, which operate as membranes, in the tank. Thenceforth, osmosis proceeds. The case, then, becomes similar to *United States* v. *Reid & Co., supra,* wherein we said:

> From these definitions it is plain that to constitute a centrifugal machine, the machine itself or some portion thereof must so move as to produce the desired results by centrifugal force. If the material to be operated upon moves by its own force, we cannot conceive such a result to be produced by a centrifugal machine. In the case before us here, the device in question is, in our judgment, no more a centrifugal machine than the worm of a still would be.

We are of opinion that the imported articles are not classifiable as machines or parts thereof.

As an alternative proposition, appellee contends that the grids and wire-mesh nets are dutiable at 25 per centum ad valorem under paragraph 318 of said tariff act, the material part of which is as follows:

> PAR. 318. Woven-wire cloth: Gauze, fabric, or screen, made of wire composed of steel, brass, copper, bronze, or any other metal or alloy, not specially provided for, with meshes not finer than thirty wires to the lineal inch in warp or filling, 25 per centum ad valorem * * *.

The appellee did not appeal from the judgment of the court below, which judgment found the imported goods to be dutiable under said paragraph 372 at 27½ per centum ad valorem. The appellee, by its claim under said paragraph 318, seeks a more favorable judgment than it received in the court below, namely, a rate of 25 per centum. It is well settled that a party may not have this relief unless it appeals. *Surgical Supply Imp. Co.* v. *United States,* 3 Ct. Cust. Appls. 112, T. D. 32364; *United States* v. *Von Oefele,* 4 Ct Cust. App s. 284, T. D. 33492; *Johnson Co.* v. *United States,* 13 Ct. Cust. Appls. 373, T. D. 41318; *Pacific Iron & Metal Co.* v. *United States,* 15 Ct. Cust. Appls. 433, T. D. 42605; *United States* v. *Pyrometer Inst. Co.,* 21 C. C. P. A. (Customs) 376, T. D. 46910.

The judgment of the United States Customs Court is *reversed.*